# Exhibit C

1           IN THE UNITED STATES DISTRICT COURT FOR THE

2                      DISTRICT OF MARYLAND

3    ----------------------------x

4    SALLY W. TARQUINIO,              :

5          Plaintiff,                 :

6     vs.                             :     Case No.

7    JOHNS HOPKINS UNIVERSITY         :     1:23-cv-00727-RDB

8    APPLIED PHYSICS LAB,             :

9          Defendant.                 :

10   ----------------------------x

11

12

13              DEPOSITION OF DR. MARC SCHWARTZ

14                 Philadelphia, Pennsylvania

15                 Monday, October 30, 2023

16                       10:05 a.m.

17

18

19

20   Job No.: 510567

21   Pages: 1 - 79

22   Recorded By: Emil White

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                          4

```
1                    C O N T E N T S

2    EXAMINATION OF DR. MARC SCHWARTZ            PAGE

3        By Mr. Ross                               5

4        By Mr. Schifanelli                       65

5

6                    E X H I B I T S

7            (Attached to transcript.)

8    DEPOSITION EXHIBIT                          PAGE

9    Schwartz 1    Amended Notice of Deposition    6

10   Schwartz 2    Email, Plaintiff to            26

11                  Accommodation's Coordinator,

12                  JHU00001-00003

13   Schwartz 3    Email, Plaintiff to            36

14                  Accommodation's Coordinator,

15                  JHU00035-00075

16   Schwartz 4    Plaintiff's Objections and     47

17                  Responses to Interrogatories

18   Schwartz 5    Amended Complaint              52

19   Schwartz 6    Request for Subpoenaed Documents 61

20                  to Dr. Schwartz from

21                  Jackson Lewis, PC

22   Schwartz 7    Dr. Schwartz Notes for Plaintiff 61
```

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                          20

1    a sample, just some of the herbs that are in your

2    protocol?

3         A    Yes.  Andrographis, Japanese knotweed.

4    Those are the two major ones.  Samento is also

5    one.  Those are the big, probably the most common

6    ones.

7         Q    So when a patient comes in and you

8    diagnose them with Lyme, is it automatic that they

9    get the -- the Japanese knotweed and those herbs,

10   or do you do a more individualized assessment as

11   to what each patient may or may not need?

12        A    Well, it's individualized.  Yeah.  And

13   the herbal cocktail is a cocktail.  It's a mixture

14   of maybe 10 or 12 different herbs.  But the

15   leading herbs are andrographis, Japanese knotweed,

16   but it's all individualized, based on the person

17   who's at the appointment.

18        Q    Okay.  So there's no one-size-fits-all

19   treatment here.  You have to do an individualized

20   assessment and then you determine what it is --

21   the best path to treat them is?

22        A    Correct.

1        Q     Have you seen this document or any

2    portion of this document before?

3        A     I think I've signed the back page, so I

4    must have seen it.

5        Q     Well, let's jump to the back page,

6    then.  You're referring to the page titled,

7    Medical Verification for Exemption --

8        A     Correct.

9        Q     -- from COVID-19 Vaccination

10   Requirement?

11       A     Correct.

12       Q     Okay.  And I think you're referring,

13   when you say you've signed it, about two-thirds of

14   the way down the page, there's a line that says,

15   Healthcare Provider, and a signature.  Is that

16   your signature?

17       A     Correct.

18       Q     And what is the date of your signature?

19       A     9-29-21.

20       Q     Do you have any recollection of signing

21   this document?

22       A     It's vague now, but I do remember going

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                    28

1    back and forth with Sally about it.  Yeah.

2         Q    Okay.  So you have no reason to doubt

3    that that is your signature there?

4         A    No.

5         Q    Okay.  About halfway down the page,

6    there is a -- a bolded line that says, The

7    above-named person should not be immunized for

8    COVID for the following reasons.  Please check all

9    that apply.  Do you see that?

10        A    I do.

11        Q    And then the third box is -- is checked

12   or Xed; do you see that?

13        A    Correct.

14        Q    And it says, Other.  Please provide

15   this information in a separate narrative that

16   describes the reason, in detail.  These requests

17   will be reviewed on a case-by-case basis.  Do you

18   see that?

19        A    I do.

20        Q    Okay.  So after that, there is what

21   appears to be a handwritten portion.  Are you able

22   to read that?

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                         29

1          A     I am.

2          Q     And what does it say?

3          A     It's chronic Lyme disease and

4    Lyme-induced autoimmune -- Lyme-induced immune

5    dysregulation.

6          Q     Okay.  Is that your handwriting?

7          A     No.

8          Q     So you don't believe that you're the

9    one who wrote, Chronic Lyme disease plus

10   Lyme-induced immune dysregulation?

11         A     I didn't write that.

12         Q     Okay.  Is chronic Lyme disease plus

13   Lyme-induced immune dysregulation an accurate

14   diagnosis for Ms. Tarquinio's condition?

15         A     I -- I believe so.  I think there was

16   also the autonomic dysregulation.  That was also

17   part of it.

18         Q     And -- well, I -- I still need you on

19   that page.

20         A     Uh-huh.  Sure.  No worries.

21         Q     So Chronic Lyme disease plus

22   Lyme-induced immune dysregulation.  Now, I know

1  you didn't write that, but are they separate

2  conditions?

3       A    Well, they are separate, but there's

4  really nothing separate when it comes to the body.

5  And so the chronic Lyme infection that she had

6  induced some autoimmune kind of dysregulation.

7  And so it is two separate issues.

8       Q    So is it possible for someone to have

9  chronic Lyme disease, but not Lyme-induced immune

10  dysregulation?

11       A    Repeat that?

12       Q    Is it possible for a patient to have

13  chronic Lyme disease, but not have Lyme-induced

14  immune dysregulation?

15       A    No, it would -- it would have both.

16       Q    Okay.  So they are separate, which, if

17  you have one, you necessarily have the other; is

18  that your -- is that your testimony?

19       A    Correct, except it's -- it's a -- it's

20  a movement where the immune dysregulation is not

21  causing the Lyme disease, but the Lyme disease is

22  causing the immune dysregulation.

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                    31

1      Q    Understood.  Do -- you've testified

2   that you didn't write that.  Do you have any

3   reason to doubt that Sally wrote those words?

4      A    I don't know who wrote those, but I

5   know it's not my writing, because I typically

6   write in all capitals.

7      Q    Is there anyone from your office, or

8   your practice, who would -- who would've been

9   authorized to write this on a medical form, other

10  than yourself?

11     A    I don't know if -- who -- I don't know

12  if anyone from my office wrote that.

13     Q    Are you the only physician in your

14  office?

15     A    I am.

16     Q    Okay.  Did you instruct Sally what to

17  write on this form, after the checks box -- checks

18  -- checked box, other?

19     A    I don't know.  I only knew that she was

20  requesting exemption from the shot for chronic

21  Lyme disease.

22     Q    So --

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                                    32

1      A     She may have added those in.  I don't

2  know.

3      Q     Is it fair to say that you did not, or

4  you don't recall, dictating chronic Lyme disease

5  plus Lyme-induced immune dysregulation to Sally to

6  write on this form?

7      A     Correct.  I don't recall.

8      Q     Do you recall whether this page of the

9  document was completed before you signed your name

10 to it?

11     A     I don't recall.

12     Q     That's -- it was a long time ago.  I'm

13 -- I'm sure you've signed many forms since then,

14 so -- so no problem.  So did Ms. Tarquinio ask you

15 to sign this form?

16     A     She did.

17     Q     And what is your understanding of why

18 Ms. Tarquinio asked you to sign the form?

19     A     Well, I think I was signing the request

20 for an exemption for the shot.

21     Q     So at the top of that page, it says,

22 Johns Hopkins Applied Physics Laboratory.  So

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                    33

1    we've agreed to call them, the lab?

2         A    Correct.

3         Q    Is it your understanding that Ms.

4    Tarquinio intended to submit the form that you

5    signed to the lab?

6         A    Correct.

7         Q    Okay.  And is it your understanding

8    that the purpose of submitting the form was to get

9    at this exemption from taking the COVID-19 vaccine?

10        A    Correct.

11        Q    Did you -- well, do you recall having

12   conversations with Ms. Tarquinio on or around

13   September 29th, 2021, when you signed this, about

14   the COVID vaccine?

15        A    I -- I don't recall the specific time

16   or date.  I remember having conversations with her

17   about immune dysregulation and autonomic

18   dysregulation.  Yes.

19        Q    So did you ever speak to anyone from

20   Ms. Tarquinio's employer at the -- the lab

21   regarding her request to be exempted from the

22   vaccine?

1       A      No.

2       Q      Why not?

3       A      No one ever contacted me.

4       Q      So no one from the lab, her employer,

5    contacted you about her request for an exemption?

6       A      Correct.

7       Q      If you had gotten a phone call from the

8    lab, or someone at the lab wanting to talk about

9    it, would you have taken that phone call?

10      A      Sure.

11      Q      Are you -- are you allowed to speak

12   with a patient's employer without the patient's

13   authorization?

14      A      I would probably need authorization

15   first.

16      Q      Why is that?

17      A      Well, I think just the rights of the

18   patient.

19      Q      Okay.  HIPAA-type concerns?

20      A      HIPAA concerns.  Correct.

21      Q      Did Ms. Tarquinio ever ask you to speak

22   with her employer about her -- her exemption

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                    42

1       A    Correct.

2       Q    And is that to indicate that this study

3  or this article is from February 2005, or at least

4  published in February of 2005?

5       A    Correct.

6       Q    Okay.  Is it fair to say that COVID-19

7  was not known to humanity in February 2005?

8       A    I don't think COVID-19 was part of what

9  this article was about, though.

10      Q    Well, that -- I think that answers my

11 next question, but let's -- let's go back.  Does

12 -- does February 2005 predate COVID-19 in your

13 understanding?

14      A    Yes.

15      Q    Okay.  So then back to where -- you

16 were ahead of me.  Now, back to where you -- you

17 were leading us.  Is this article addressing

18 COVID-19?

19      A    No.

20      Q    Does this article address vaccinations

21 from virus, generally?

22      A    No, I don't believe so.

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                    43

```
1        Q     So then, was the purpose of you sending
2   this article to Ms. Tarquinio to support her
3   request to -- to be exempted from the COVID-19
4   vaccine requirement?
5        A     The purpose was to just give her some
6   reading material that the autoimmune dysregulation
7   is a common factor with Lyme disease.
8        Q     I understand.
9        A     Right.
10       Q     Oh, did I cut you off?
11       A     No.  No.
12       Q     Okay.  So the -- you sent this article
13  to Sally to educate her; is that correct?
14       A     Correct.
15       Q     Did you know what she intended to do
16  with it?
17       A     I had no idea what her plan was, but I
18  was, you know, offering her information about
19  immune dysregulation, which is in the literature
20  in regards to Lyme disease.  And so that was the
21  -- the -- the purpose of it.
22       Q     Okay.  Understood.  Let's go to the
```

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                              45

1        A    Correct.

2        Q    And on the bottom of this page, it

3   says, Copyright 2004.  Do you see that?

4        A    Correct.

5        Q    So safe to say, this article was

6   published in 2003 or 2004?

7        A    Correct.

8        Q    And would you agree that 2003 or 2004

9   predates COVID-19?

10        A    Correct.

11        Q    So this article is not about COVID-19,

12   correct?

13        A    Correct.

14        Q    Does this article discuss vaccination

15   from viruses, generally?

16        A    This article does not.

17        Q    So was the reason that you sent this

18   article to Sally, the same reason as you sent the

19   first article to Sally?

20        A    Yes.  Was providing her information

21   about the autoimmunity -- immune dysregulation

22   associated with chronic Lyme disease.

Transcript of Dr. Marc Schwartz
Conducted on October 30, 2023                          46

1        Q     Okay.

2        A     Yes.

3        Q     So it's -- it's safe to say -- well,

4    strike that.

5              Is it your understanding that

6    neither of these articles are about Sally

7    Tarquinio, specifically?

8        A     They're not specific to her, but they

9    describe or give her some reference as to the

10   immune dysregulation that she was suffering with.

11   Correct.

12       Q     So the -- both of these articles are

13   more -- would you say they're more generalized

14   information about her condition?

15       A     I didn't hear you.

16       Q     Would you say that both of these

17   articles are more general information related to

18   her condition?

19       A     Correct.

20       Q     Okay.  Why don't we take a five-minute

21   break here?

22             THE REPORTER:  Stand by.  Off the

1   And so what was the question initially?  We lost --

2        Q    Well, I -- I think the question was

3   whether it was the messenger RNA mechanism that

4   was the -- the -- driving your -- your advice or

5   your guidance to Sally?

6        A    Right.  I would say that it was a -- a

7   large percentage of what was driving my decision

8   or advising her.  And then also the -- whether any

9   other vaccine would be indicated because of her

10  immune status and the autonomic dysregulation she

11  was under.

12       Q    Okay.  So the mRNA piece was, I think

13  you said, a large portion of your advice, correct?

14       A    Correct.

15       Q    Okay.  All right, other than -- you can

16  put those two to the side.  I think we are done

17  with them.  Other than the form you signed --

18  excuse me, the exemption form you signed on

19  September 29th, 2021, and the two articles we

20  discussed, do you recall sending Sally any other

21  documentation related to her vaccine exemption

22  efforts?

1      A      Immune dysregulation.

2      Q      Immune dysregulation.  Do you advise

3  all of your long Lyme patients to avoid taking any

4  vaccine, whatsoever?

5      A      You know, I advise them based on how

6  dysregulated I think they are.  And, you know, if

7  they're suffering with immune dysregulation for

8  the majority of the time that I'm seeing, it's

9  probably not smart to put in another antigen

10 during that -- that -- that moment when the

11 situation arises.  And so I -- my firm belief is

12 that, you know, if you're immune dysregulated,

13 autonomic dysregulated, it's probably not good to

14 put an antigen in.

15     Q      So it's a case-by-case, or a

16 patient-by-patient analysis --

17     A      It is.  It is.

18     Q      -- assessment?  Because if there were

19 such a blanket statement, you'd be out of work,

20 right?  Okay.

21          Let me give you another document. I'll

22 mark this as Schwartz Exhibit 6.  Okay.  Take as

# Dr. Schwartz's Deposition

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

SALLY W. TARQUINIO

     Plaintiff,

     v.                      Civil Action No. 1:23-CV-00727

JOHNS HOPKINS UNIVERSITY
APPLIED PHYSICS LAB

     Defendant.

## PLAINTIFF'S AMENDED OBJECTIONS AND RESPONSES TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33 and District of Maryland Local Rule 104, by and through its undersigned counsel, Plaintiff Sally Tarquinio's ("Tarquinio" or "Plaintiff") hereby provides objections and answers to Defendant Johns Hopkins University Applied Physics Lab ("APL" or "Defendant") First Set of Interrogatories.

## GENERAL OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

A. Plaintiff objects to each interrogatory to the extent that it purports to request information protected from disclosure by the attorney-client privilege, the accountant-client privilege or the attorney work-product doctrine. Plaintiff shall not provide such protected information.

B. Plaintiff objects to the instructions to Defendant's interrogatories to the extent that they purport to impose upon the Plaintiff obligations in addition to or different than those imposed by Federal Rules of Civil Procedure and the Local Rules of this Court.



Exhibit #

Schwartz 04

10/30/23

## ANSWERS

**INTERROGATORY NO.** 1:
State the index, docket, complaint, charge or other identification number or designation of any litigations or administrative charge, including but not limited to bankruptcy proceedings and criminal proceedings, in which you have been a party or testified as a witness, other than the instant action, the date(s) such proceeding(s) were initiated, and the current status or final disposition of each such proceeding.

**ANSWER:**

Court System:           Circuit Court For Anne Arundel County - Civil

Location:       Anne Arundel Circuit Court

Case Number:        02-C-07-123689

Title: Sally W Tarquinio vs Amado G Fentriss

Case Type:      Tort - Motor

Filing Date:  07/02/2007

Case Status:  Closed / Inactive


**INTERROGATORY NO. 2:**
State whether you have ever lodged an internal complaint of harassment, discrimination, or retaliation, whether formal or informal, at any time with any person or entity. If the answer is yes, state the name of all such entities and persons, the nature of the complaint lodged and the resolution thereof.

**ANSWER:**

I filed a complaint against a former APL supervisor Mr. Tom Eubanks/ Program Area Manager for harassment & discrimination. I was transferred to another branch and with Jim Hanson as my Assistant Group Supervisor.

I also filed a complaint while employed with FORE Systems. Shortly afterwards I was laid off (reduction in force). I directly appealed to the HR Director, and my severance package was increased. (No law suit filed.)

**INTERROGATORY NO. 3:**
Identify by full name, address, telephone number, and employer, each person, other than any legal counsel, with whom you or your representatives have communicated regarding this lawsuit, the allegations in your Complaint, or the subject matter of the allegations in your Complaint, and describe the date, place, method of communication, all individuals involved in the communication, and summary of the communication.

**ANSWER**

1.      Mimi French (Ducane)
7095 Samuel Morse Dr, Suite 100
Columbia, MD 21046
Mimi.Ducane@feddata.com
443-293-2880 (Cell)
~3/10-12 2022

Employer: Federal Data Systems
Method: Verbal

Summary: I had informed Ms. Ducane about the ADA denial & wrongful termination for not complying with the mandate in our second exchange I believe. I didn't want to waste their time or mine. They indicated there was no issue, and found a specific job that they wanted to extend me an offer on. But the database did not show any clearances for me when finalizing the job offer, and I did not receive a formal offer.


2.      Justin Burley, Lead Recruiter

Employer: CACI International

12021 Sunset Hills Road, Reston, Virginia 20190.

~3/18/22
~4/8/22 Todd Randolph, verbal and SF-86. Date

Method: Verbal and email

Summary: ADA denial & wrongful termination.


3.      Cindy Martin/HR

Employer: LinQuest

(~4/xx/23)

Method: Verbal

Summary: About my ADA request denial & wrongful termination.


4.      Scott Giffen, FSO/CPSO

2551 Dulles View| Suite 200 | Herndon, VA | 20171
P: 703-740-9637|M: 571-233-2400

Method:Verbal and on form SF-86

5.      Possibly anyone I interviewed with if ask why I am looking for a position and question the last date of employment, including:


CACI - Dahlgren
HR
Hiring manager - Dan White, Zoom call

Northrop Grumman
Email to HR
Hiring mgr interview - verbal

Carnegie Mellon University Software Engineering Institute
5/25/23 - Tracey Montegomery HR
Verbal


**INTERROGATORY NO. 4:**
Identify each prospective employer whom you have contacted in any way and describe in detail every other attempt you have made or are making to secure employment with any person or entity other than APL since July 1, 2021, to the present. For each such prospective employer you have contacted, identify the following:

a. Dates of each contact;
b. Contact was by email, other written correspondence, over telephone, or in person;
c. Names of the individuals with whom you corresponded, spoke with, or had any other contact with;
d. Position or type of work you sought;
e. Geographic location of position or job you sought; and
f. Results, e.g. "received job offer," "telephone interview," "no response," "rejected job offer," etc.


For all other attempts you have made or are making to secure employment, identify the following:


g. Each & every job board search website you are (or were) registered on or a member of since July 1, 2021, to the present and each & every employment opportunity, advertisement, bid, or proposal you have answered, responded to or pursued


h. All correspondence you have sent to or received from all employment agencies, government agencies, placement agencies, temporary placement firms, internet job application sites, or search firms you have contacted


i. All job offers received, include job title & salary offered, or alternatively, whether you have rejected any offer of employment since July 1, 2021, and if so, explain in detail the reasons for each rejection.


j. All persons, other than prospective employers, with whom you have discussed your job search

of possible employment.


k. All persons with whom you have discussed providing you a reference, or from whom you have sought a reference.


**ANSWER:**

Federal Data Systems
3/9/2022 - in-person TechExpo job fair - Baltimore
3/10 - 22 Mimi French (Ducane), EVP - phone, text, email, online job post application
3/22 - 24 Kiyana, Senior Intel Recruiter for FEDDATA. Text & phone
Systems Engineering
Maryland/Virginia
Informed me were extending me a Systems Engineer 2 job offer. However my clearances did not show up in database.
Resulting in no offer.

Federal Data Systems
3/22/22 - online job submittal, Deputy Program Manager
4/4 - email & gmail follow-up with Portia Brooks
No reply

CACI.
3/9/22 - In person with Seth Mitchell
3/10 - 6/13 22 phone & email - recruiter Justin Burley
4/6 Interview with hiring manager
4/7 - Accepted Job offer
4/8 - 6/13 numerous phone & email - Security Officer Todd Randolph regarding SF-86 and scheduling of polygraph
6/13/22 informed Navy would not confirm clearance and be submitted as if I did not even have a SECRET.


Lockheed Martin
3/22/2022
Submitted application to online job postings
Systems Engineering posts & Senior Staff Info Systems Analyst
Maryland & Virginia
No response


11/19/22Hanover in-person Open House
Damian


CACI - Dahlgren VA
HR, email & phone
Interview with Hiring Manager, Dan White

Position cancelled

3/23/23 in-person Job Fair - Herndon VA

LinQuest

Northrop Grumman

CMU Software Engineering Institute

4/13/23 in-person Job Fair - Baltimore
Akima
HII
Freedom

4/7/22. CACI - Sr. Systems Engineer (TSE4) $185,000
Accepted
3 mths later, the Navy would not confirm clearance

4/13/23. LinQuest - Principal Systems Engineer $190,000
Accepted. Awaiting NRO to approve clearance.

- Terri Saus. (retired from NSA - email)
- Lee Johnson (retired from NSA - verbal)

**INTERROGATORY NO. 5:**
Please identify any & all e-mail account(s), whether personal or work-related, that you have had in your name or on your behalf from July 1, 2021 to the present.

**ANSWER:**

Sally.tarquinio@jhuapl.edu
Starquin@comcast.net
Zengarden.st@gmail (backup email)
Starquin33@protonmail.com

**INTERROGATORY NO. 6:**

Describe in complete detail each item of damage, including amounts, for which Plaintiff intends to seek recovery at a trial of this matter, and describe the manner in which such amount has been calculated, and the specific basis and support for each amount. Your description should include each element or component of recovery that you seek and the amount sought for each element or component, the manner in which each element or component of the calculation was determined, and should identify the source of each number used in the calculation.

**ANSWER:**

Please refer to the prayer in the Complaint and any amendments thereto filed in this matter. Plaintiff reserves the right to amend these answers as compensatory damages are scrutinized further and further evidence supporting punitive damages, if any, is acquired.

**INTERROGATORY NO. 7:**

Describe all income, benefits, compensation, or other monies you have received from any source other than APL since July 1, 2021 to the present but not limited to employment, self-employment, compensation for services performed as a contractor, unemployment benefits, pensions, state or federal grants or subsidies, and charitable organizations including the amount of money received and the date(s) upon which Plaintiff received such monies.

**ANSWER:**

Plaintiff reserves the right to amend this answer as more information becomes available.

**INTERROGATORY NO. 8.**

If you have been examined by, treated by, diagnosed by or have otherwise consulted with physician, psychologist, psychiatrist, hospital, nurse, therapist, counselor (religious or otherwise), or other health care provider (collectively "health care provider") for a reason relating in any way to your claims or alleged damages in this litigation, including in connection with any request for leave under the Family and Medical Leave Act ("FMLA") or for an accommodation under the Americans with Disabilities Act ("ADA"), then identify each such health care provider.

For each such health care provider, provide name, address & phone number, dates of each consultation, a description of any complaint, examination results, disability slips, diagnosis, treatment, prescription, medication & prognosis for each such consultation, and the identity of each report, note or other document generated as a result of such consultation.

Dr Marc Sivieri
Dr Marc Schwartz
Dr Carol Phillips
Peter Marenakis
Mary Hill Byrne
HBOT
BRAIN egg
Other

**INTERROGATORY NO. 9:**

Identify the specific document(s) Plaintiff provided to APL which included an opinion from a medical provider stating that Plaintiff suffered from a disability and that specific accommodations were necessary for Plaintiff to perform the essential functions of Plaintiff's job.

Please also include the specific date(s) such document(s) was/were provided to a representative of APL and identify the representative of APL to whom such document(s) was delivered, and identify APL's response.

**ANSWER:**

Please refer to documents produced in Plaintiff's Responses to Defendant's Document Requests.

**INTERROGATORY NO. 10:**

Identify Your "treating physician's recommendations specifically relating to [Your] Lyme disease diagnosis and treatment" as you allege in Paragraph 9 of the Complaint. Include your identification the recommendation or recommendations your treating physician made as it pertains to Your alleged request for an accommodation.

**ANSWER:**

I have been diagnosed with "Chronic Lyme" disease (a/k/a "post-treatment Lyme disease (PTLD), post-treatment Lyme disease syndrome (PTLDS), or long Lyme…") and because I was infected two times in 2004 and 2012, respectively. Late treatment after the initial infections resulted in late-stage symptoms and signs that, although the pathogen was either killed or weakened during antibiotic treatment, are still often debilitating systems persist.
Late disseminated Lyme disease may last for years and results can be permanent. The infection can spread to the joints or contribute to altered brain function, a condition known as encephalopathy. Common symptoms of late disseminated Lyme disease include:

a.      Arthritis with joint pain, warmth, and swelling that may be constant or come and go. Lyme disease-related arthritis typically occurs in one joint, usually the knee or another large joint, though it can also occur in more than one joint.

b.      Concentration issues, brain fog, and memory issues

c.      Nerve pain that feels like tingling, numbness, burning, or stabbing in the hands and feet (peripheral neuropathy)

d.      Anxiety, depression, mood swings, and other neuropsychiatric issues

e.      Sleep disturbances such as difficulty falling or staying asleep, need for extended sleep, or unrefreshing sleep.

I suffer from many of these and have other symptoms as well.  Persistent symptoms of Lyme disease are real and well documented. However, the cause (or causes) are poorly understood. There are various theories, but the most relevant are,

a.      Immune system dysregulation. That is, the body's response to fighting infection runs amok and persists long after it is helpful. This may be due to lingering spirochete (Lyme bacteria) proteins, persistent inflammation, or other autoimmune issues; and

b.

Lingering infection: It is possible there may be active infection that is hard to detect. Limited case studies, and studies in animal models, have shown evidence of persistent spirochetes, but there is not yet definitive evidence of persistent Lyme disease infection in humans.

My treating physician, Dr. Schwartz, considered that receiving the COVID mRNA vaccine could adversely affect my immune system and therefore determined that this vaccine is contraindicated for my Lyme/Chronic Lyme diagnosis and for which he has been treating my symptoms.

**INTERROGATORY NO. 11:**

Identify any person who has, claims to have, or whom Plaintiff believes may have knowledge or information pertaining to any fact alleged in the pleadings filed in this action, or any underlying the subject matter of this action. Include in your response the specific nature & substance of the knowledge that Plaintiff believes each person may have.

**ANSWER:**

Jordan Nosgrove - Former Assistant Group Supervisor - as a manager, had been made aware of the planning that APL took to make it as painful & coercive as possible to coerce staff members into compliance and censor risks and other options

Andrew Newman, Group Sup - same as Jordan. Observations of what it took to receive an accommodation (ie, Group, Branch, Department advocating). That staff were lead to believe that only those who refused to be tested were fired. Why management determined that the 6 ft spacing etc which had resulted in no one I worked with getting sick (not me) in any incidents until the day I was fired, no longer were sufficient.

Joanne ?. The specific diagnosis that she/her doctor provided that led to her receiving her medical accommodations.

Bert ? - my office mate. Observations of inappropriate behavior of executive management. Personal experience with requesting/receiving remote tasking. My verbal complaint in August 2021 of the incoming Chief of Staff's ignoring the 6 ft distancing mandate and extending his hand to shake at the beginning and end of our

Mario Stalker - colleague who had an office across the hall. Observations of the process.

Dan Dockery - my Branch Supervisor. What responses did he receive after advocating for my retention, especially given his understanding of Lyme disease and my contributions to APL? What efforts were made to find remote work? Who contacted Geoff Uy and other PMs for possible tasking? Why was Geoff Uy not informed of my denial the Monday before I was notified as was stated policy , and did not know until I informed him three days later? Observations of whether APL went well beyond the CDC guidines. Why was it determined that the 6 ft spacing I had been adhering to was no longer sufficient, especially since I had been working on site the entire time

What reasons did Jeff Tober and HR provide for not postponing my termination? Especially given I was given only 4 days (Tuesday 3pm to the following Monday) to either get a vaccine that my doctor strongly advised me to take, agree to forced retirement or termination. And after the reason for my denial (my blood test results were nine years old), and when I provided recent test results, a new reason was given all within the same week to grasp what was done?

Amy Billups - my Group Supervisor. Describe the actions she undertook to find other work for me to do remotely and advocate for me receiving an accommodation. (My PM had informed me that he had been instructed to stay out of any involvement supporting me wrt the accommodations process. I understood that was a responsibility of the Group Supervisor.)
Why had she not informed me, as I'd requested, of all the consequences of chosing a "forced retirement" vs. "APL termination" for non-compliance after my ADA accommodations request - there was no mention of administratively revolking my clearance until my exit interview on 12/7/21 at 3 pm?

What did she mean by her statement to me that "it was becoming clear to many people that "this" was not about health"

What actions did she take when I complained that Erik Johnson (incoming Chief of Staff, and former Managing Executive of the R&D department conducting PCR PCR testings, mRNA research...) extended his hand out to me at the start & end of our August meeting I had requested to answer concerns. Such as why can't I find the EUA vials?
Why did everyone on my exit-interview Zoom appear shocked that I was the only one calling in from my APL office, and that I had no APL property for a remote office, as I had always worked on site. How were the risks assessed if that basic understanding was not known?

John Schmidt - Had been a Group Sup when I had interfaced with him. Stated views on Lyme Disease, and staff members who had received disability from it.

John Delinish - Colleague working on the same program as me - in the car when John Schmidt (a Group Supervisor at the time) made derogatory comments about the woman who took disability from Lyme Disease.

Mark Kopyc - a contractor (former employee) no issues

Elizabeth (last name unknown) - a member of my team. Her observations of working on the GPI program, with 6 ft distancing and no incidents of illness related to me.

Erik Johnson - incoming Chief of Staff. Follow-up to his comments of how many hours was he spending with the Biden Administration advising them on how to stop the CDC flip flopping and better ensure compliance? (He had How did APL choose the specific doctors he said he would be announcing that he was bringing in to calm people's fears that the v*'s were safe & effective?


**INTERROGATORY NO. 12:**
Identify all "similarly situated employees" who were "given the option to telecommute or appear remotely" as alleged in Paragraph 13 of Your Complaint.

**ANSWER:**

12.1 My office mate, Bert ? even though vaccinated still worked remotely.
12.2 Mario Stalker
12.3 All of the SM-6 Blk 2, who mostly worked at home
12.4 many of hypersonics workers worked from home for some % of time;

**INTERROGATORY NO. 13:**
Identify the "other positions" that "were available comparable to Plaintiffs skill set" that You contend You "could have been placed and which would have required either no or even more limited in-person attendance at the APL facility" as alleged in Paragraph 14 of Your Complaint.

**ANSWER:**

Typically it is a responsibility for Group Sups, Assistant Group Sups, Section Sups, and Branch Sups to find testing for their staff.

While I have always found my taskings while at APL, I hadnt lined up remote tasking because I truly couldn't fathom that Ilmy accommodations request would ve denied. There were no risks, no issues... I had agreed to continued testing. .

What were the issues with the position I had on the Glide Phase interceptor Program? Keep doing what I had done. I had recently been promoted, and was asked to take on more responsibility each month I had ocersaw/coordinated engineering studies & MBSE (submitted status reports, verified quality before the PM signed off. .), was co-lead of Working Group, troubleshooter, evaluation support, mentoring, ....

We held zoom mtgs, classified VTCswith 6 foot distancing of APL team members, classified labs with the 6 ft distancing. I'd been working onsite since the start of the pandemic until my last day of employment, without any incident.

There were so many options that management could have considered besides what had worked well. Easily GPI work that I could have done at night when few were in the lab. Review of documents, write quarterly status reports, etc.

Other positions that I could have done, especially with Zoom calls include but just a spit of what could have been explored:

Spearhead/Architect needed closed-loop System-of-System Modeling & Simulation.
Validation, Verification & Accreditation planning and documentation.
Any quality control position. - review documents, recommend enhancements or coordinate needed enhancements.
Requirements
MBSE modeling

I SWEAR UNDER THE PENALTIES OF PERJURY THAT THE FOREOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY ABILITIES.

08/04/2023

*Sally Tarquinio*

Sally Tarquinio